Milligan, J.,
dissenting:
I regret I am unable to concur in the opinion of the court just announced. The grounds on which it mainly rests, in my judgment, is not the turning question raised in the record. Outside of the question of the competency of Thomas Henry as a witness, which, under the same facts now in this record as to him, was decided adversely in the former trial, the real question is as to the right of the agent to invest the funds of his principal in the cotton in question.
It is an admitted fact that the power of attorney under which the agent acted, dated June 9,1859, conferred on him no general powers. It was special in its nature and character, and expressly limited to settling up the business of the principal, selling off his real and personal 'estate, and collecting in his debts. It conferred no power on the agent to reinvest the money derived from any of these sources, or to engage in any speculation, however tempting or advantageous to the principal. The agent treated his authority in this light, and could, I think, have viewed it in no other. He says, after stating that he had collected about $30,000 for the claimant, including $5,000 due from himself, that “ I concluded to invest this money of the claimant, which I held as I did my own, principally in cotton.” The cotton was purchased on the agent’s own discretion, and without any previous knowledge or authority of his principal. Had this been done in time of peace, or by an agent residing in time of war within the same belligerent territory where the principal resided, and the act, with full knowledge of all the circumstances, afterward ratified by the principal, there -would h*ave been no difficulty in it. But it is far different in time of war, wrhere the principal resides, as in this case, in one belligerent territory, and the agent in the other. In such a case it is -well settled, on grounds of public law, as well as under the act of Congress, that all commercial intercourse between the two belligerents is unlawful. The only exception to this universal rule, if indeed it can be called an exception, is when the sovereign, after war breaks out, licenses a limited or special trade between the inhabitants of the belligerents. In the late rebellion this could have been done by the President under the act ©f July 13,18G1, according to the regulations prescribed by the Secretary of the Treasury, but in no other way.
*357 But it is said, that this rule is not violated in cases where the principal resides, in time of war, iu one of the belligerent territories, and has an agent appointed before the war, residing in the other. Iu such a case the agent, if known and duly authorized thereto, may receive in money the payment of debts due his principal there. But the books go no further, and, in fact, very cautiously announce this doctrine, and sparingly treat of the reasons on which it rests. (See Ward v. Smith, 7 Wall. R., 447; Conn. v. Penn., 1 Peters, C. C., 496; Dennison v. Imbree, Ib., 396; Paul v. Christie, 4 Harris & McHenry, 161.)
But, admitting this doctrine, which certainly is not strongly sustained by the elementary writers on public law, do the facts of this case bring it within the rule ? It is clear to my mind they do not. In fact, it is not pretended, either in the argument or by the agent himself, that he had any previous authority to invest the- claimant’s money in his hands in anything whatever. He says that “ there were three sources of investment presented to him, viz, real estate, sterling exchange, and cotton, and he preferred the latter.” Now the question is, had he the authority to make the investment; and if not, does the subsequent ratification by his principal confer it? It is clear, if the act was void, and not merely voidable, no subsequent ratification can make it valid. (Story on Agency, § 240.) Was it void? The answer is found in the transaction itself. The agent says he made the investment for his principal; and the cotton, the proceeds of which is now claimed by the principal without contest on the part of the agent, is the identical cotton thus bought for the claimant. It is conceded that Stoddart, then residing out of the insurrectionary district, could not have made this purchase, for that would have been trading directly with the enemy, and unlawful by the statute. Then, can he do by an agent, self-constituted and acting for his principal, what he could not do himself? Certainly this cannot be the law. The act of purchase, being for the principal, was void, and no subsequent ratification can make it valid.
In Grossmeyer’s Case (9 Wall. R., 72) Justice Davis, in delivering the judgment of the court on a question involving this doctrine, says: u Besides, if, as is conceded, Grossmeyer was prohibited from trading directly with the enemy, how can the purchase in question be treated as lawful, when it was made for him by an agent appointed after his own disability to deal at *358 all with tbe insurgents was created 9” He adds: “ It is claimed that the purchase by Einstein was ratified by-Grossmeyer, and that it relieves the case of difficulty, but this is a mistaken view of the principle of ratification, for a transaction originally unlawful cannot be made any better by being ratified.”
This seems conclusive of the point under consideration, for there can be no valid distinction between appointing an agent during the war, as in Grossmeyer’s case, to deal with the enemy, and in ratifying, while the war is in progress, the acts of an assumed agent who had. done the same thing for his principal. Both, in my judgment, are unlawful, and not to be countenanced or encouraged by the courts. Hardships, doubtless, arise under the rigor of this rule, but the public policy of all civilized communities is subserved by it. A great number of cases might be cited to illustrate the uniformity with which it has been enforced, but I shall only refer to a few, which will serve to show the rule and reasons on which it rests.
In the case of The Hoop, (1 Bob., 198.) Sir William Scott, in discussing the leading principles of reason and policy on which all trading and intercourse with an enemy, except by the permission of the sovereign, was interdicted, said, in substance, that the sovereign, who has the power of entirely removing the state of war, has the power of removing it in part by permitting, when he sees proper, that commercial intercourse which is a partial suspension of war. But it is not for individuals to determine on the expediency of such occasions. It is for the state alone, on more enlarged views of policy and of all the circumstances that may be connected with such intercourse, to determine when it shall be permitted, and under what regulations.
And again, the case of Willison v. Patterson et al. (7 Taunton, 439) is to the same general effect. In that case a Frenchman at Dunkirk, in France, in time of war, having goods in the hands of of the defendants, who were merchants in London, drew three bills of exchange on the defendants, which were duly remitted and accepted, to be paid when the goods were sold. The goods were sold and the proceeds received by the defendants. The bills were indorsed by the Frenchman to the plaintiff, an Englishman, residing in France, and suit was brought on them after peace. In delivering the opinion of the court, Chief Justice Gibbs said: “It is illegal for an alien in an enemy’s country, *359 ■during war, to draw a bill on a subject resident in England and then sue him after peace for the amount of such. bill. It gives rise to a communication between subjects of both countries, which ought to be avoided. The drawing and the accepting •o/ the hills were acts in themselves illegal. All communication with an alien enemy during war must be prohibited, and is so by the policy of the law.”
Chancellor Kent, in the great case of Griswold v. Waddington, (16 John. R., 483,) after reviewing all the leading authorities on this point, in summing up says that “ there is no authority in law, whether that law be national, maritime, or municipal, for •any kind of private voluntary unlicensed business, communication, or intercourse with an enemy. It is all noxious, and, in •a greater or less degree, it is all criminal. Every attempt at ■drawing distinctions has failed; all kinds of intercourse, except that Avhich is hostile, or created by the mere exigencies of war .and necessity of the case, are illegal.”
Other authorities might be added, to the same effect, almost to an indefinite number, but enough have been presented to illustrate the principle which, in my judgment, ought to rule .the decision of this ease. It may be the strict application of this principle here contended for will impinge on some of the •opinions of this court heretofore made, but it must be remembered that they were delivered before the judgment in Gross-meyer’s case was pronounced by the Supreme Court, and if ■either has to give way, the former must yield, and not the latter.
Added to these reasons, I think, as the court held in the former opinion in this case, Thomas Henry was an incompetent ■witness, and his testimony ought to be rejected.
The petition should be dismissed.